UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| RAYMOND KOUGH and MARY KOUGH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:12-CV-250-PLR-HBG |
| | ) | |
| WING ENTERPRISES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

On December 15, 2014, counsel for the parties appeared before the undersigned to address Defendant's Motion for Daubert Hearing to Strike and Disallow Testimony of Plaintiffs' Disclosed Expert, Tyler Kress and to Strike Plaintiffs' Rule 26 Disclosure of Expert Witness and any Reports or Opinions Expressed by Tyler Kress [Doc. 28]. The Court finds that this motion is now ripe for adjudication, [see Docs. 29, 39], and for the reasons stated herein, it will be **GRANTED IN PART** and **DENIED IN PART**.

The Court will first address two initial matters raised by the parties: (1) the timeliness of the Plaintiffs' expert disclosure and (2) the filing of the Defendant's memorandum in support. In regard to the timeliness of the Plaintiffs' disclosure of Tyler Kress, Ph.D., the Court finds that the Plaintiffs' failure to timely disclose the testimony was harmless under the circumstances, and the Court will not exclude Dr. Kress from testifying based upon this error. In regard to the Plaintiffs' allegation that the Defendant failed to re-docket their memorandum as a filing, rather than a proposed, filing, the Court finds that this error is equally harmless.

In addition, the Court finds that the Plaintiffs' response to the Defendant's motion and memorandum was itself untimely, see E.D. Tenn. L.R. 7.1. The Court finds that this error was also harmless, and the Court will not exclude Dr. Kress's testimony on this basis.

Having addressed the preliminary matters and procedural objections, the Court turns to the substantive arguments raised pursuant to Rule 702 of the Federal Rules of Civil Procedure and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

I.  BACKGROUND

Plaintiffs allege that, in approximately June 2004, Plaintiff Ray Kough purchased a Little Giant Ladder, produced by Defendant Wing Enterprises, and since that time, Mr. Kough has used the ladder in a manner expected of a reasonable consumer. [Doc. 55 at 2]. Plaintiffs allege that, on May 11, 2011, Mr. Kough was using the ladder in the extended position to take measurements to repair storm damage of a second story window on his home. The ladder allegedly failed, causing Mr. Kough to fall to a concrete surface and suffer severe and permanent injuries. [Id.].

Defendant denies any liability and takes the position that Mr. Kough's accident was the result of Mr. Kough failing to follow the manufacturer's safety and operation instruction manual and his failure to exercise reasonable and due care for his own safety. [See Docs. 38, 55]. Defendant maintains that the accident occurred due to Mr. Kough's own negligence and not from any defect in the ladder. [Doc. 55 at 4].

## II.    POSITIONS OF THE PARTIES

Defendant moves the Court to exclude Dr. Kress from offering expert testimony in this case pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Civil Procedure. [Docs. 28, 29-1]. Defendant argues that Dr. Kress is not qualified by knowledge, skill, experience, training, or education to offer expert testimony in this case. Defendant contends that Dr. Kress's testimony includes *ipse dixit* opinions, including his opinion that the rivets on the left hinge of the ladder failed due to fatigue from "cyclical stress," which caused the fall. Defendant maintains that Dr. Kress is not qualified to opine regarding such metallurgical issues and has not provided any reliable evidence to support that opinion. Defendant argues that Dr. Kress has based his testimony and opinions on his own speculative assertions which are not supported by tests, peer review, evidence of reliability, or other scientific data.

Plaintiffs respond that Dr. Kress's education in engineering generally qualifies him to offer testimony regarding metallurgical issues. Plaintiffs concede that Dr. Kress is not a licensed, professional engineer, nor is he a metallurgist. His training and experience is in the field of "human factors." Plaintiffs argue that his education and experience "touch[] nearly [every] facet of engineering," and Plaintiffs note that Dr. Kress was exposed to metallurgical science through a class he took as an undergraduate in 1986. [Doc. 39 at 5]. Plaintiffs maintain that Dr. Kress used the same metallurgical test, optical fractographic analysis, as was used by Defendant's expert, which they contend demonstrates the general acceptance of the method. Plaintiffs also argue that Dr. Kress is qualified, by his background in human factors analysis, to offer opinions as to whether "Mr. Kough [] used the ladder in a manner consistent with a reasonable user." [Id.].

3

### III. ANALYSIS

In Plaintiffs' disclosures, Dr. Kress proposed to offer testimony that the responsibilities of a prudent manufacturer include complying with the following axioms:

1. In so far as possible, foreseeable hazards will be reduced to acceptable levels through the design process.

2. Hazards that cannot be "designed away" will be appropriately guarded against.

3. The production process will have appropriate manufacturing facilities and have QA/QC methods to assure that the product meets the design specifications.

4. Products will be tested to validate their safety status. Improvements will be made through design iteration.

5. Users will have appropriate manuals, training, qualification, and necessary warnings so that they understand the hazards and are knowledgeable users.

6. The actual use experience will be monitored and feedback obtained to permit possible improvements in safety, design, production, warnings, and manuals.

[Doc. 18 at 3]. Dr. Kress proposed to opine that the Defendant "failed in one [or] more of the above axioms, specifically with respect to design, manufacturing, and/or adequate warnings/hazards communications." [Id.]. Dr. Kress proposed to further testify:

> **The failure of the subject ladder was due to a design and/or manufacturing defect and it did not break as a result of Mr. Kough falling on it.** The failure is not something that an ordinary consumer or user would identify, nor even anticipate. Defects can include inappropriate riveting (e.g. too hard, too deep), stress risers, design, and/or manufacturing processes causing inadequate strength and/or wear characteristics at the hinge mechanism and/or lock tab assemblies, etc. The failure of the subject ladder's center area was due to a tension-based mechanism consistent with Mr. Kough's explanation of the incident in which he did not fall on the broken ladder. Yet during reasonably foreseeable and normal loading conditions the ladder broke due to inadequate design and/or manufacturing.

[Doc. 18 at 4].

At the hearing before the undersigned, Plaintiffs represented that Dr. Kress, who has never designed a ladder, would not offer any alternative designs or manufacturing processes. [Doc. 53 at 11]. Instead, Plaintiffs focused upon the metallurgical testimony, which was not included in Plaintiffs' disclosures but was later added at his deposition. He stated that he determined the metal composition of the ladder through "familiarity with ladder [] construction," and that he used a "magnet test" on the metal. [Doc. 53 at 50]. He conceded that he did not know the actual metallurgical composition of the ladder, or the rivets in question, "because it can vary sometimes within the suppliers and aluminum," but he generally described it as "aluminum primarily with steel, also." [Id. at 50-51]. He added that he also looked up the patent on this ladder. [Id. at 50]. Dr. Kress could not state the strength values for the ladder. [Id. at 51]. Dr. Kress stated that he did cyclical fatigue calculations based upon Mr. Kough's testimony. [See id.]. With regard to a manufacturing or design defect, he testified:

> Q: You say the design is defective and you say the manufacturing process was defective. How did you determine that? What did you use?
>
> A: Well, what, what I determined is that we had – I think, I think – I believe that there was evidence that indicates that we had failure of the ladder beyond the way in which a consumer would expect it to fail.

[Id. at 52-53].

At his deposition, Dr. Kress expanded upon his general opinion with a focus on failure of the metal rivets in the ladder. In part, he stated:

> Q: Okay. Do you have an opinion as to which side, the left side, as he had it set up where the bent part of the frame comes down, or the right side, which one of those failed first?
>
> A: I do, yes.
>
> Q: Which one do you think?

5

> A: I believe this is a failure associated with the rivets; so it's the left side.
>
> Q: Okay, sir. And do you have an opinion as to what caused the failure of the rivets that you think happened?
>
> A: I do. I believe it was cyclical loading over time, and fatigue.
>
> Q: And have you done any tests to confirm that?
>
> A: Well, I have examined this ladder extensively, I have looked at, with magnification, very closely to every single damaged rivet on both sides of the rivet at every failure surface in great detail, and I took some photographs of it too. Obviously I looked at it for much longer than the photographs would depict, but . . . And studied this, the nature of the bent metal, and what the physical evidence associated with the subject ladder, precisely what engineers do, to understand how it failed and what the details of the mechanism were.
>
> . . . .
>
> Q: [Y]ou said you had taken magnified photographs, so I'm assuming that they will show more detail than what we can just visually see here.
>
> A: Well, I certainly looked at it with magnification, and clearly my camera has a zoom lens on it, and I did take some zoom photographs . . . .

[Doc. 20-7 at 13].

In support of these opinions and his qualifications, Dr. Kress described himself as having "done a lot of metal examination over the years as part of my normal practice in my research and in my laboratories." [Doc. 53 at 45]. He noted to the Court that his most recent, peer-reviewed publication addressed crashing motorcycles into large package vehicles and trucks that are

6

riveted, which he stated involved calculating the energy and failure mechanisms of various metal components on motorcycles and trucks. [Id.].[1]

With Dr. Kress's testimony and disclosures in mind, the Court will address the issues presented in turn.

*A.     Tennessee Products Liability Law*

In evaluating Dr. Kress's testimony, the Court must consider the applicable law to determine the relevance of the testimony, reliability of the testimony, and its potential aid to the jury. The parties agree that jurisdiction in this case is invoked pursuant to 29 U.S.C. § 1332, [Doc. 55 at 1], and therefore, Tennessee products liability law governs Plaintiffs' claims.

As the Court of Appeals for the Sixth Circuit has explained, Tennessee law recognizes two different tests for determining whether a product is unreasonably dangerous:

> The first, the consumer-expectation test, is used where a product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." Ray ex rel. Holman v. BIC Corp., 925 S.W.2d 527, 530 (Tenn.1996); see also Brown v. Raymond Corp., 432 F.3d 640, 643-44 (6th Cir. 2005). The second, the prudent-manufacturer test, imputes knowledge of the dangerous condition to the manufacturer, and then asks "whether, given that knowledge, a prudent manufacturer would market the product." Ray, 925 S.W.2d at 530. As the Tennessee Supreme Court has articulated, "[t]he consumer expectation test is, by definition, buyer oriented; the prudent manufacturer test, seller oriented." Id. at 531.

Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 428-29 (6th Cir. 2007).

At the hearing, the Court asked Plaintiffs' counsel which of these two tests Plaintiffs were proceeding on in this case, and counsel stated that the Plaintiffs' position is that the ladder at issue would fail both tests. [Doc. 53 at 4]. With regard to the prudent-manufacturer test,

---

[1] Plaintiffs conceded that the article to which Dr. Kress referred was not provided to the Court or opposing counsel, nor was it referenced in the curriculum vitae provided to the Court and opposing counsel. However, the article and an updated curriculum vitae was provided to the Court and opposing counsel following the hearing. These submissions were marked as Exhibit 1 to the hearing.

7

counsel stated that the Plaintiffs are proceeding under a theory that both the design of the ladder and the manufacturing of the ladder were defective. [Id. at 5]. Plaintiffs' counsel argued that the design was defective because it created a stress riser. He argued that the manufacturing of the ladder was defective because the rivets on the ladder were not made of appropriate materials and, as a result, they failed. [Id. at 6]. Plaintiffs' counsel stated that Plaintiffs' theory is that cyclical stress resulted in the ladder's failure, though counsel did not clarify whether the alleged cyclical stress failure was a design defect or a manufacturing defect. [Id. at 9].

It was unclear from counsel's representations at the hearing what Plaintiffs' theories for recovery were, and at best, it appeared Plaintiffs were attempting to proceed under all possible theories simultaneously. As indicated by Dr. Kress's testimony described above, Dr. Kress was similarly vague and appeared to combine both the consumer-expectation test and prudent-manufacturer test into a single theory.

Following the hearing before the undersigned, the parties filed their proposed pretrial order, which was entered by the Court on December 30, 2014. In the Pretrial Order, the Plaintiffs again appear to proceed under both the consumer-expectation test and the prudent-manufacturer test. Though Plaintiffs do not specifically allege that the ladder failed to meet the expectations of a reasonable consumer, Plaintiffs do allege that "Mr. Kough was using the ladder in a manner expected of a reasonable consumer . . . ." [Doc. 55 at 2]. Additionally, Plaintiffs allege: "The Defendant was negligent in the designing, testing, manufacture, and marketing of the product, which rendered it unsafe and defective in that the rivet bindings at the hinging, mid-section of the ladder were inadequate to handle the cyclical loading of the stress risers created by the design of this ladder." [Id.].

While the consumer-expectation test and the prudent-manufacturer test "are neither mutually exclusive nor mutually inclusive," Brown v. Raymond Corp., 432 F.3d 640, 644 (6th Cir. 2005) (quoting Ray, 925 S.W.2d at 531), the Plaintiffs' seeming inability to state the test(s) entitling them to recovery and Dr. Kress's continued merging of the two tests present a challenge as the undersigned attempts to evaluate the relevancy component of the Daubert / Rule 702 standard.

### B. *Rule 702 of the Federal Rules of Evidence*

Federal Rule of Evidence 702 governs the admission of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court of the United States stated that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 589. The Daubert standard "attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171, 176–77 (6th Cir. 2009).

Although the Rule 702 requirements are treated liberally, "'that does not mean that a witness is an expert simply because he claims to be.'" Coffey v. Dowley Mfg., Inc., 187 F.

Supp. 2d 958, 971 (M.D. Tenn. 2002) (citing Pride v. BIC Corp., 218 F.3d 566, 577 (6th Cir. 2000)).

The factors relevant in evaluating the reliability of the testimony, include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." Coffey v. Dowley Mfg., Inc., 187 F. Supp. 2d 958, 970-71 (M.D. Tenn. 2002) (citing Daubert, 509 U.S. at 593–94). "Thus, a party must show, by a "preponderance of proof," that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." Id. (quoting Daubert, 509 U.S. at 593-94). The Rule 702 inquiry as "a flexible one," and the Daubert factors do not constitute a definitive checklist or test. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 138-39 (1999) (citing Daubert, 509 U.S. at 593).

Additionally, the Court of Appeals for the Sixth Circuit "has recognized for some time that expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution." Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 434 (6th Cir. 2007). The Sixth Circuit adopted the reasoning of the Court of Appeals for the Ninth Circuit, explaining:

> That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science. . . . If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on "scientifically valid principles."

10

Id. at 434 (citing Daubert v. Merrell Dow Pharmaceuticals, 43 F.3d 1311 (9th Cir. 1995) ( "Daubert II"). The Sixth Circuit found this reasoning to be "equally sound" in the context of evaluating technical or engineering experts. Id. at 435.

*1.  Metallurgical Opinions (Prudent-Manufacturer Test)*

Dr. Kress's disclosure does not identify a specific theory of either manufacturing defect or design defect. However, from Dr. Kress's testimony and counsel's representations it appears that Dr. Kress intends to offer an opinion that Mr. Kough's fall was caused by failure of metal rivets in the ladder.

The Court finds that Dr. Kress is not qualified to offer such testimony. In support of his qualifications, Dr. Kress states that he took a class in metallurgical sciences as an undergraduate, approximately thirty years ago. See Ex. 1, Kress C.V. at 1. Dr. Kress appears to suggest that his general engineering degree, with an emphasis in biomedical engineering, renders him an expert in all possible facets of the engineering profession. The relevant case law does not support such a sweeping expertise, nor does it support the idea that one or two classes taken as an undergraduate will produce a qualified expert in a given field.

Plaintiffs' counsel conceded at the hearing on this motion that of the over one hundred "publications and presentations" by Dr. Kress, none dealt with the subject of metal ladder failure and/or ladder design. Dr. Kress, however, testified that he recently produced a peer-reviewed work that addressed metals and rivet failure in auto accidents. See Ex. 1. The title of this article, "Motorcycle Velocity Determination from Impact Damage," offers the first indication that the article is not the culmination of research that would aid in determining whether rivets failed in a ladder. A review of the article itself confirms that the research undertaken therein does not support Dr. Kress's proposed expertise in this case. As the article's abstract states, "The purpose

11

of this research is to provide a methodology of relevant computations in common real-world PTW (motorcycle) crashes to assess or evaluate the energy dissipated in the motorcycle and the crash partner (or other vehicle; OV)." Id. at 3. The Court finds that this particular research does not support finding Dr. Kress to be qualified to opine as an expert on the failure of the metal rivets in this case.

In reaching the above conclusion, the Court has contrasted Dr. Kress's education, experience, and qualifications with other proposed experts in metallurgical sciences. For example, in Maricco v. Meco Corp., 2004 WL 6081574 (E.D. Mich. 2004), the court found that, though an expert had not been involved in the design or manufacture of step stools, he was qualified to testify as to metallurgical failure in such stools, because "he established his expertise in metallurgy and the use of steel and other metals in manufacturing, citing his co-authorship of a textbook, his publication of numerous articles, and his undergraduate and graduate teaching on such subjects as manufacturing processes, materials for manufacturing, and manufacturing considerations in design." Id. at *5.[2] Dr. Kress's general engineering degree, undergraduate class in metallurgical science, and research on motorcycle crashes are not tantamount to such qualifications, and the Court cannot find that they satisfy Rule 702.

The Court has also considered Dr. Kress's expertise as offered in other cases. Other courts considering Dr. Kress's qualifications generally identify him as an industrial ergonomist, an expert in biomedical and biochemical engineering, or an expert in ergonomics. See, e.g., Hardy v. Union Pacific R.R. Co., 2011 WL 5295199 (D. Colo. 2011) (addressing Dr. Kress's proposed opinions regarding whole body vibration and musculoskeletal disorders in a railroad, personal-injury case); Myers v. Ill. Cent. R.R. Co., 679 F. Supp. 2d 903 (C.D. Ill. 2010) (addressing Dr. Kress's proposed opinions regarding repetitive use of musculoskeletal system

---

[2] The expert at issue in Maricco was ultimately excluded from testifying on other grounds.

12

and lack of ergonomic improvements in a railroad, personal-injury case). Within this District, Dr. Kress has been offered as an expert in a wide breadth of areas. See Parris v. Regions Bank, No. 3:11-CV-514, Doc. 24 (proposing Kress as an expert in standards for sidewalk maintenance; Kress withdrawn as expert); Rhea v. Brown Manu. Corp., No. 3:08-CV-35, Docs. 32-1 & 73 (proposing Kress as an expert regarding injury caused by tree cutter and its foreseeability; Daubert challenge denied based upon Kress's expertise in "trauma and injury prevention"); DeBakker v. Hanger Prosthetics & Orthotics East, Inc., No. 3:08-CV-11, Doc. 77-1 (proposing Kress as an expert regarding manufacture of knee braces and foreseeability of brace failing; case settled prior to decision on Daubert challenge). However, the Plaintiffs have not cited the Court to any case in which Dr. Kress has been offered as an expert in metallurgical opinions similar to those proposed in the instant case or any case in which a court has deemed Dr. Kress to possess a similar expertise under Rule 702.

Accordingly, the Court finds that Plaintiffs have not demonstrated that Dr. Kress is qualified to offer expert testimony regarding metallurgical sciences, and specifically, Plaintiffs have not demonstrated that Dr. Kress is qualified to offer testimony regarding the failure of the metal rivets in the ladder at issue.

Alternatively, the Court finds that metallurgical opinions from Dr. Kress are not sufficiently reliable under Rule 702. That is, the Court finds that Plaintiffs have failed to demonstrate that the testimony is the product of reliable principles and methods or that Dr. Kress has applied the principles and methods reliably to the facts of the case. In so finding, the Court has considered Dr. Kress's own testimony, including his testimony that: he did not know the metallurgical composition of the rivets, but had anecdotally concluded it was an aluminum and steel composite; he looked at the rivets under unspecified magnification; he took photographs of

the rivets using an otherwise unspecified camera zoom; he did not know the strength value of the metal; and he could not determine a cyclical load number for the ladder and generally estimated the use of the ladder. Additionally, the Court has considered Dr. Kress's concession that he did not submit his work to any other person for review and that he relied upon textbooks, which were not disclosed in his expert report, in formulating his opinions.

The Court also finds that the record in this case demonstrates that Dr. Kress prepared his testimony solely for this litigation. His education and experience are essentially devoid of any research performed in this area, and it certainly appears that, if not for this case, Dr. Kress would have never evaluated the metallurgical characteristics of rivets in ladders. Consistent with the case law of the Sixth Circuit, "[where the] proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" Johnson, 484 F.3d at6 434 (citing Daubert II). The Plaintiffs have failed to bring forth such evidence in this case, and to the contrary, the evidence before the undersigned indicates that the testimony was not based on "scientifically valid principles."

In sum and for all the reasons stated above, the Court finds that: (1) Dr. Kress is not qualified to offer metallurgical opinions relating to the alleged ladder failure in this case; and (2) Dr. Kress's proposed metallurgical opinions are not sufficiently reliable. Therefore, the Court finds that Rule 702 of the Federal Rules of Evidence requires that the Court exclude Dr. Kress from offering such testimony at trial. To the extent that Dr. Kress's testimony regarding a prudent manufacturer's standards relate to metallurgical science, he is precluded from offering such testimony.

*2.     Opinions Regarding Consumer Expectations (Consumer-Expectation Test)*

The parties' briefs and arguments addressed Dr. Kress's testimony as a whole, and the Defendant has moved the Court to bar Dr. Kress "from giving any expert testimony or producing any evidence in the trial of this cause." [Doc. 29-1 at 26]. The Court finds that the record is sufficient to examine the admissibility of such testimony. Thus, the Court turns to the other testimony proposed by Dr. Kress in his disclosure.

Dr. Kress has proposed to testify that: "The condition of the ladder was not such that an ordinary consumer or individual would decide that it should not be used" and "The failure [of the ladder] is not something an ordinary consumer or user would identify, nor even anticipate" [Doc. 18 at 4]. Taken together, it appears Dr. Kress intends to testify about an ordinary consumer's expectations.

The Court finds that the Plaintiffs have not demonstrated that Dr. Kress is qualified to offer expert testimony regarding consumer expectations. A review of Dr. Kress's education and experience does not demonstrate that he has any particular insight into the mind of the average consumer. Moreover, the Plaintiffs have not demonstrated that Dr. Kress's opinion regarding consumer expectations is "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. To the contrary, jurors in this case will be familiar with the use of ladders for household tasks and a consumer's expectations of such products. In this regard, it appears that Dr. Kress also seeks to opine that Mr. Kough did not "misuse" the ladder at the time of the incident. [Doc. 29-2]. Again, this is a determination for the jury to make without the need for expert opinion.

Additionally, the Plaintiffs have failed to cite any methodology employed by Dr. Kress in reaching his conclusions about an ordinary consumer's expectations. Specifically, the Court has

not been cited to any methodology that could be tested, subjected to peer review, or deemed to be generally-accepted.  See Coffey, 187 F. Supp. 2d at 970-71.  The Court finds this lack of methodology supports exclusion of such testimony.

Finally, the Court again finds that, to the extent Dr. Kress has performed any type of research in forming his consumer-expectation opinions, that research was performed solely for purposes of this litigation and is outside the scope of his general research.  The Court finds that this fact also supports exclusion of such testimony.  Johnson, 484 F.3d at 434 (citing Daubert II).

## IV.  CONCLUSION

Consistent with the Court's findings herein, the proposed opinion testimony of Dr. Kress shall be excluded.  Defendant's Motion for Daubert Hearing to Strike and Disallow Testimony of Plaintiffs' Disclosed Expert, Tyler Kress and to Strike Plaintiffs' Rule 26 Disclosure of Expert Witness and any Reports or Opinions Expressed by Tyler Kress **[Doc. 28]** is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

ENTER:

_Bruce Guyton_
United States Magistrate Judge